# In The United States Court Of Appeals For The Third Circuit

### THE PUBLIC INTEREST LEGAL FOUNDATION,

*Appellee/Cross-Appellant*,

v.

### AL SCHMIDT, in his official capacity as SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA, and JONATHAN M. MARKS, in his official capacity as DEPUTY SECRETARY FOR ELECTIONS AND COMMISSIONS,

*Appellants/Cross-Appellees*.

Appeal From Final Order Entered by U.S. District Court for the Middle District of Pennsylvania in Case No. 1:19-CV-622

### BRIEF OF THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS/CROSS-APPELLEES

Brian C. Frontino
MORGAN, LEWIS & BOCKIUS LLP
600 Brickell Avenue, Suite 1600
Miami, FL 33131
T. 305.415.3000
F. 305.415.3001

John P. Lavelle, Jr.
Matthew D. Klayman
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
T. 215.963.5000
F. 215.963.5001

*Counsel for* Amicus Curiae *The League of Women Voters of Pennsylvania*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, *amicus curiae* the League of Women Voters of Pennsylvania makes the following disclosure:

1)     For nongovernmental corporate parties, please list all parent corporations:

*None.*

2)     For nongovernmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:

*None.*

3)     If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

*None.*

4)     In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: (1) the debtor, if not identified in the case caption; (2) the members of the creditors' committee or the top 20 unsecured creditors; and, (3) any entity not named in the caption which is an active participant in the bankruptcy

proceeding. If the debtor or trustee is not participating in the appeal, this information

must be provided by appellant.

*Not applicable.*

Dated: September 13, 2023                    *s/ John P. Lavelle, Jr.*
                                             John P. Lavelle, Jr.

                                             *Counsel for* Amicus Curiae *The League*
                                             *of Women Voters of Pennsylvania*

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ............................................................i

Table of Authorities ..............................................................................iv

Interest of *Amicus Curiae* ....................................................................1

Introduction and Summary of Argument.................................................2

Argument.................................................................................................5

    I.    A "Central Purpose[]" of the NVRA Is to Expand, Not
        Discourage, Voter Registration. .........................................5

    II.   The NVRA Has Fulfilled Its "Central Purpose[]" By Helping to
        Expand Voter Registration. ...............................................11

    III.  PILF Seeks Disclosures That Would Undermine the NVRA's
        "Central Purpose[]" and Discourage the Exercise of the Right to
        Vote. ..................................................................................13

Conclusion ............................................................................................21

Certificate of Bar Membership, Compliance with Type-Volume Limitation
    and Typeface Requirements, and Virus Check ............................22

Certificate of Service ............................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Campaign Legal Ctr. v. Scott*,
   49 F.4th 931 (5th Cir. 2022) ...........................................................3, 13

*Common Cause of Colo. v. Buescher*,
   750 F. Supp. 2d 1259 (D. Colo. 2010)................................................9

*Husted v. A. Philip Randolph Inst.*,
   138 S. Ct. 1833 (2018)......................................................................6

*Kelly v. RealPage Inc.*,
   47 F.4th 202 (3d Cir. 2022) ...........................................................3, 13

*Pennsylvania State Educ. Ass'n v. Commonwealth Dep't of Cmty. & Econ. Dev.*,
   148 A.3d 142 (Pa. 2016)......................................................10, 14, 18

*Project Vote, Inc. v. Kemp*,
   208 F. Supp. 3d 1320 (N.D. Ga. 2016)........................................10, 19

*Project Vote/Voting for Am. v. Long*,
   752 F. Supp. 2d 697 (E.D. Va. 2010) .....................................10, 19, 20

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
   996 F.3d 257 (4th Cir. 2021) ...................................................6, 14, 15

*Stern v. FBI*,
   737 F.2d 84 (D.C. Cir. 1984)...........................................................15

*True the Vote v. Hosemann*,
   43 F. Supp. 3d 693 (S.D. Miss. 2014) ............................................20

*United States v. Briggs*,
   514 F.2d 794 (5th Cir. 1975) ...........................................................15

*Welker v. Clarke*,
   239 F.3d 596 (3d Cir. 2001) .............................................................5

STATUTES

National Voter Registration Act
    52 U.S.C. § 20501 *et seq.* .........................................................................*passim*
    52 U.S.C. § 20501.................................................................................6, 8, 9
    52 U.S.C. § 20504.........................................................................................6
    52 U.S.C. § 20507....................................................................................9, 10

OTHER AUTHORITIES

Batuhan Kukal, *Personal Data and Personal Safety: Re-Examining the Limits of Public Data in the Context of Doxxing*, INT'L DATA PRIVACY L. (June 30, 2023), *available at* https://academic.oup.com/idpl/advance-article/doi/10.1093/idpl/ipad011/7216381 ................................................................................................17

Congressional Research Service, *Federal Role in Voter Registration: The National Voter Registration Act of 1993 and Subsequent Developments* (Jan. 23, 2019), *available at* https://crsreports.congress.gov/product/pdf/R/R45030/6...11, 12, 20

*Doxxing*, INT'L DATA PRIVACY L. (June 30, 2023), *available at* https://academic.oup.com/idpl/advance-article/doi/10.1093/idpl/ipad011/7216381.....................18

H.R. Rep. No. 103-9 .............................................................................6, 7, 8, 9, 10

J. Mijin Cha, *Registering Millions: The Success and Potential of the National Voter Registration Act at 20* (May 20, 2013), Demos, *available at* https://www.demos.org/sites/default/files/publications/RegisteringMillions-NVRA-Demos_2.pdf....................................................................................11, 19

PBS & NPR, *State, Counties Prepare to Keep Pa. Polling Places Safe Amid Fears of Militia, Hate Groups* (Oct. 31, 2020), *available at* https://whyy.org/articles/state-counties-prepare-to-keep-pa-polling-places-safe-amid-fears-of-militia-hate-groups/..........................................................................................................19

PILF, *Alien Invasion in Virginia: The Discovery and Coverup of Noncitizen Registration and Voting* (Sept. 30, 2016), *available at League of United Latin Am. Citizens v. PILF* ("*LULAC*"), No. 18-cv-423 (E.D. Va. June 14, 2019), ECF No. 181-2 ....................................................................................12, 15, 16

PILF, *Aliens and Felons: Thousands on the Voter Rolls in Philadelphia* (October 4, 2016), *available at* https://publicinterestlegal.org/pilf-files/Philadelphia-Litigation-Report.pdf ...........................................................................13

PILF, *North Carolina Motor Voter at 30 Years: The Cause and Barrier to Stopping Non-Citizen Voting* (June 2023), *available at* https://publicinterestlegal.org/wp-content/uploads/2023/06/Motor-Voter-at-30-North-Carolina-FINAL.pdf...............................................................................13

PILF, *Pennsylvania Required To Provide PILF With Voting History Of Non-Citizens The Commonwealth Added To The Voter Roll* (April 4, 2022), *available at* https://publicinterestlegal.org/press/pennsylvania-required-to-provide-pilf-with-voting-history-of-non-citizens-the-commonwealth-added-to-the-voter-roll/ ..........................................................................................18

S. Rep. No. 103-6.............................................................................................6, 7

Southern Coalition for Social Justice, *Voters Strike Back and Win Settlement and Apology in Challenge to Voter Intimidation in Virginia* (July 21, 2019), *available at* https://southerncoalition.org/voters-strike-back-and-win-settlement-in-virginia/.........................................................................17

U.S. Atty's Office of D.C., *District Man Charged in Investigation of Illegal posting of Restricted Personal Information of U.S. Senators on Website* (Oct. 4, 2018), *available at* https://www.justice.gov/usao-dc/pr/restricted-personal-information-us-senators-website......................................................17

U.S. Election Assistance Commission, *Election Administration and Voting Survey 2020 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 117th Congress* (Aug. 2021), *available at* https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c.pdf ...........................................................................11, 12

## INTEREST OF *AMICUS CURIAE*

The League of Women Voters of Pennsylvania (the "League") is a nonpartisan, nonprofit voting rights organization. The League is committed to promoting civic engagement and protecting democracy in Pennsylvania through advocacy, voter education, and voter assistance. The League advocates for policies that make it easier for U.S. citizens residing in Pennsylvania to vote, particularly those who have traditionally confronted obstacles to exercising that right. The League works also with state and local election officials to educate voters on their rights. The vast majority of the League's members are Pennsylvania voters.

The League has a strong interest in the issues of law before the Court. Based on its extensive experience working with, and advocating for, Pennsylvania voters—including groups of voters that have historically been marginalized and the targets of voter intimidation and historic disenfranchisement—the League seeks to ensure that the Court considers the real-world implications of allowing public disclosure of the highly personal voter information that the Public Interest Legal Foundation ("PILF") seeks (and which PILF likely will use in a manner that discourages U.S. citizens' exercise of their fundamental right to vote).

All parties to the appeal have consented to the filing of this brief. No party's counsel authored this brief in whole or in part. No party, party's counsel, or person

other than the League, its members, or its counsel provided money for the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents a critical question concerning the access to information available under the National Voter Registration Act ("NVRA"). PILF is attempting to misuse the NVRA to compel disclosure of the names and addresses of thousands of Pennsylvanians registered to vote but who PILF asserts—but has never proven— to be noncitizens ineligible to vote. According to PILF, the names and addresses should be disclosed because they identify noncitizens who may have inadvertently registered to vote due to a software error when applying for a Pennsylvania driver's license online with the Pennsylvania Department of Transportation ("PennDOT"). The NVRA obviously was not intended to grant access to such personal information under these circumstances.

Though PILF did not demonstrate any need for the identities and contact information of these individuals and such information is unnecessary to advance the intent of the NVRA, the district court agreed with PILF and ordered certain disclosures. Most concerning to the League is the district court's order for the disclosure of names and addresses of individuals who have not been proven ineligible to vote. More than 11,000 individuals received a letter from the Pennsylvania Department of State advising them of the software error and asking

them either to certify that they meet Pennsylvania's voter qualifications or to cancel their registrations. In response, approximately 1,900 recipients responded to the letter and confirmed their eligibility to vote. Appellants/Cross-Appellee's First-Step Br. ("First-Step Br."), at 8.[1] The remainder—more than 9,100 recipients—either did not respond to the letter, had their letters returned as undeliverable, or canceled their registrations using a generic form without stating a reason for cancellation. *Id.* Though this group of recipients has not been proven ineligible to vote, the district court ordered Appellants to disclose their names and addresses to PILF.

As explained in the Department's First-Step Brief, the district court's order was erroneous. As a threshold matter, PILF lacks Article III standing because it has not shown that it suffered any concrete harm—let alone a concrete harm "directly related to the purpose of the statute"—as a result of failing to receive the names and addresses in question. First-Step Br. at 19–24 (quoting *Kelly v. RealPage Inc.*, 47 F.4th 202, 212 (3d Cir. 2022)); *see also Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 939 (5th Cir. 2022) (dismissing virtually identical suit by PILF under the NVRA for lack of Article III standing). Substantively, the NVRA's public disclosure requirement does not extend to the names and addresses of individuals potentially

---

[1] Appellant/Cross-Appellee in this case is Al Schmidt, Secretary of the Commonwealth of Pennsylvania, and Jonathan M. Marks, Deputy Secretary for Elections and Commissions (referred to collectively hereinafter as "Department" or "Department of State").

affected by a software error, particularly without any proof that those individuals are actually ineligible to vote.  And the names and addresses of registered voters that PILF baselessly suspects may be ineligible to vote constitute uniquely sensitive voter information that is not required to be disclosed under the NVRA.  The NVRA was enacted for the laudable purpose to expand access to voting, not to provide a vehicle for private actors to discourage voter registration.

Against this backdrop, the League respectfully submits this *amicus* brief to provide the Court with further detail regarding three critical aspects of this case that were mentioned, but not addressed fully, in the Department's First-Step Brief.

First, the history and purpose of the NVRA unquestionably weigh in favor of encouraging voter registration and participation.  They cannot be construed to require disclosures intended to discourage voter registration and participation as PILF appears to intend to use the information it seeks under the guise of the NVRA. The NVRA was adopted in recognition of the central importance of voting rights to American democracy and the need to promote the exercise of those rights.  It came in response to decades of attempts to put obstacles in the way of potential voters (especially citizens of color) and recognized that it is the government's duty to reverse that trend.

Second, the NVRA has been a massive success, providing millions of Americans with expanded opportunities to register and contributing to a huge

increase in the number of registered voters, consistent with the purpose of the NVRA. PILF's action seeks to reverse this success by using the NVRA to discourage voter registration and participation. This is contrary to Congress's intent and should not be endorsed by this Court.

Third, there is a substantial risk that PILF will use any individualized information disclosed under the NVRA in a manner that would discourage voter registration and participation. PILF has a demonstrated track record of misusing voter registration information in a manner that can harass and intimidate voters. The Court should rule that the NVRA does not require disclosure of uniquely sensitive voter information relating to a special investigation of a software error rather than a mandated removal program.

## ARGUMENT

### I.  A "Central Purpose[]" of the NVRA Is to Expand, Not Discourage, Voter Registration.

More than two decades ago, this Court recognized that "[o]ne of the NVRA's central purposes was to dramatically expand opportunities for voter registration[.]" *Welker v. Clarke*, 239 F.3d 596, 598–99 (3d Cir. 2001) (citation omitted). The NVRA largely achieves this purpose by requiring states to offer the opportunity to register to vote at their motor vehicle licensing offices (known in many states as Department of Motor Vehicle ("DMV") offices), armed services recruitment offices, and certain other government offices that primarily engage in providing public

assistance and services to persons with disabilities. *See* 52 U.S.C. § 20504 *et seq.*; *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021).

In the NVRA itself, Congress identified the purposes of the statute to include the establishment of "procedures that will ***increase*** the number of eligible citizens who register to vote in elections for Federal office" and helping federal, state, and local governments implement those procedures "in a manner that ***enhances*** the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)–(2) (emphases added); *see also* H.R. Rep. No. 103-9, at 3 (1993) ("failure to become registered is the primary reason given by eligible citizens for not voting"). Congress enacted the NVRA "mindful that 'the purpose of our election process is not to test the fortitude and determination of the voter, but to discern the will of the majority.'" *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1850–51 (2018) (Breyer, J., dissenting) (quoting S. Rep. No. 103–6, at 3 (1993)). The NVRA was never meant to facilitate conduct that would ***decrease*** or ***discourage*** eligible citizens from exercising their right to vote in federal elections.

The NVRA was intended to address "unfinished business" in the country's decades-long quest to abolish impediments to the exercise of voting rights. H.R. Rep. No. 103-9, at 3. "Restrictive registration laws and administrative procedures were introduced in the United States in the late nineteenth and early twentieth

centuries to keep certain groups of citizens from voting[.]" *Id.* at 2; *see* S. Rep. No. 103-6, at 3 ("Throughout the history of this country there have been attempts to keep certain groups of citizens from registering to vote—which groups specifically depending on the decade and the locale."). Such laws and procedures targeted marginalized groups, especially immigrants (in the northern states) and Black Americans and "the rural poor" (in the southern states). H.R. Rep. No. 103-9, at 2. State-sponsored efforts to discourage the legitimate exercise of the right to vote included measures such as "[t]he poll tax, literacy tests, residency requirements, selective purges, elaborate administrative procedures and annual reregistration requirements[.]" *Id.* These restrictions were "so effective" that they contributed to a massive drop in voter turnout for Presidential elections. *Id.* ("[B]etween 1896 and 1924, the voter turnout for Presidential elections dropped from 79 percent to 49 percent. In the South, the turnout went from 57 percent to 19 percent, with the black vote dropping from 44 percent to essentially zero percent.").

Enacting the Voting Rights Act of 1965 was a watershed moment in the history of voting rights in the United States because it banned the "more obvious impediments to registration." *Id.* at 3. However, it left "a complicated maze of local laws and procedures, in some cases as restrictive as the outlawed practices, through which eligible citizens had to navigate in order to exercise their right to vote." *Id.*

In 1993, Congress passed the NVRA "to reduce these obstacles to voting to the absolute minimum while maintaining the integrity of the electoral process." *Id.* Congress recognized that there were "many factors . . . largely beyond the control of Congress" that contributed to "the lack of public participation" in federal elections, but it believed that "the difficulties encountered by eligible citizens in becoming registered to vote [was] an issue which can be directly addressed through the legislative process." *Id.* Specifically, Congress found that "[e]xpanding the rolls of the eligible citizens who are registered" was "one positive action Congress can take to give the greatest number of people an opportunity to participate." *Id.* Congress passed the NVRA to "assist in reducing barriers, particularly government-imposed barriers, to applying for registration wherever possible." *Id.*

In the NVRA, Congress made three important findings, confirming that the statute's purpose is to promote the exercise of the right to vote: "(1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a). Congress recognized that it had "the authority and responsibility to make the registration process for Federal elections as accessible

as possible while maintaining the integrity of the electoral process" and that "low voter turnout in Federal elections poses potential serious problems in our democratic society." H.R. Rep. No. 103-9, at 3.

In addition, Congress considered it a "priority" that the NVRA not "weaken the validity of the registration rolls[.]" *Id.* at 5; *see Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1273 (D. Colo. 2010) (recognizing "Congress's dual mandate in the NVRA that states not only expand their voter registration lists, but do so accurately"); *see also* 52 U.S.C. § 20501(b)(3)–(4) (identifying as purposes of the NVRA "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained"). But that Congress acknowledged the importance of maintaining accurate voter rolls of course does not mean that it was blessing all efforts—nominally in the name of election integrity—with the purpose and effect of discouraging voter registration and participation.

There is one provision that intended to help "ensur[e] the accuracy and currency of official lists of eligible voters," which is the NVRA's public disclosure provision. 52 U.S.C. § 20507(i). Congress included the public disclosure provision in the same section that describes certain programs and activities that states must undertake in administering voter registration, clearly indicating that disclosure is required ***only*** as to records relating to programs and activities mandated by the statute. *See generally* 52 U.S.C. § 20507; *see also* First-Step Br. at 28–31.

Nothing in the public disclosure provision mandates the dissemination of uniquely sensitive voter information, particularly when that information could be used to discourage voter engagement and thereby undermine the NVRA's fundamental purpose. "That Congress intended to limit certain confidential information from disclosure has been recognized by every court that has considered the NVRA." *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016); *see Project Vote/Voting for Am. v. Long*, 752 F. Supp. 2d 697, 712 (E.D. Va. 2010) (limiting the scope of disclosures and requiring redactions of Social Security numbers). For example, the disclosure provision specifically exempts from disclosure records "relate[d] to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 50207(i).[2] And there is no language in the NVRA suggesting the statute was intended to was intended to override individuals' reasonable expectation of privacy, which is afforded particularly strong protection under the Pennsylvania Constitution. *Pennsylvania State Educ. Ass'n v. Commonwealth Dep't of Cmty. &*

---

[2] The district court's order compelling the Department to disclose the names and addresses of hundreds of individuals who canceled their voter registrations using a generic form runs contrary to this directive in the NVRA, particularly when PILF seeks to paint those individuals (without proof) as likely noncitizens. *See* H.R. Rep. No. 103-9, at 8 ("an individual who declines to register to vote shall not be questioned as to the reasons for such action"). The same can be said for individuals who withdraw their registration without reason, whose identities and contact information PILF seeks to obtain as well.

*Econ. Dev.*, 148 A.3d 142, 151 (Pa. 2016) (reaffirming that "Article 1, Section 1 of the Pennsylvania Constitution provides even 'more rigorous and explicit protection for a person's right to privacy'" than U.S. Constitution) (citation omitted).

## II. The NVRA Has Fulfilled Its "Central Purpose[]" By Helping to Expand Voter Registration.

Over the years, the NVRA has been effective at furthering its express purpose of increasing the number of eligible citizens who register to vote in elections for federal office. Year over year, "DMV offices have remained the most common source among those covered by NVRA for voter registration applications received by state election officials."[3] Studies have demonstrated that the NVRA helps millions of eligible voters register," particularly low-income voters often left out of the political process.[4] For example, the 2020 election had the highest turnout of any federal general election recorded to date, showing a 6.7% increase in voter participation from 2016 and an all-time high number of voter registrations.[5]

---

[3] Congressional Research Service, *Federal Role in Voter Registration: The National Voter Registration Act of 1993 and Subsequent Developments* (Jan. 23, 2019), at 13, *available at* https://crsreports.congress.gov/product/pdf/R/R45030/6.

[4] J. Mijin Cha, *Registering Millions: The Success and Potential of the National Voter Registration Act at 20* (May 20, 2013), at 6, Demos, *available at* https://www. demos.org/sites/default/files/publications/RegisteringMillions-NVRA-Demos_2.pdf.

[5] U.S. Election Assistance Commission, *Election Administration and Voting Survey 2020 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 117th Congress* ("EAC Report"), at ii (Aug. 2021), *available at* https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_ Report_Final_508c.pdf.

The NVRA's provisions requiring maintenance of accurate voter lists is also working. According to the U.S. Election Assistance Commission ("EAC"), "states reported sending more than 28 million confirmation notices and removing more than 18 million voter registration records from their voter registration rolls between the close of registration for the 2018 general election and the close of registration for the 2020 general election."[6] Contrary to PILF's rhetoric that "aliens" are invading the states,[7] EAC reported that the most-cited reasons for removing voter registrations were (1) "failure to respond to a confirmation notice and to vote in the two most recent federal general elections," (2) "moving from the jurisdiction in which the voter was registered to vote," and (3) "the voter's death."[8] At the same time, developments in technology have also made it more feasible for agencies and officials to cross-reference records and share information to improve voter roll accuracy.[9]

The NVRA is functioning as intended by Congress and fulfilling its central purpose to expand (not contract) voter registration among eligible voters.

_____

[6] *Id.* at iv.
[7] *See infra* § III (describing PILF, *Alien Invasion in Virginia: The Discovery and Coverup of Noncitizen Registration and Voting* (Sept. 30, 2016), *available at League of United Latin Am. Citizens v. PILF* ("*LULAC*"), No. 18-cv-423 (E.D. Va. June 14, 2019), ECF No. 181-2 (referring to noncitizens as aliens and using an illustration of a UFO casting a light beam over a town on the cover page)).
[8] EAC Report, *supra* n. 5, at iv.
[9] *Federal Role in Voter Registration*, *supra* n. 3, at 13.

**III.    PILF Seeks Disclosures That Would Undermine the NVRA's "Central Purpose[]" and Discourage the Exercise of the Right to Vote.**

As demonstrated in the Department's First-Step Brief, PILF seeks disclosure of personal information concerning registrants beyond those permitted by the NVRA that risks both invading the privacy of Pennsylvania residents and misbranding U.S. citizens as noncitizens illegally attempting to vote in elections. *See* First-Step Br. at 16, 25–40.    PILF's request risks undercutting the purposes of NVRA and discouraging the exercise of the right to vote by eligible U.S. citizens. Because PILF cannot show that it suffered a concrete harm "directly related to the purpose of the statute," it cannot establish Article III standing.  First-Step Br. at 19–24 (quoting *Kelly*, 47 F.4th at 212); *see also Campaign Legal Ctr*, 49 F.4th at 939 (dismissing virtually identical suit by PILF under the NVRA for lack of Article III standing). And even if this Court concludes PILF has standing, its requested relief would undermine the NVRA's central purpose and discourage the exercise of U.S. citizens' fundamental right to vote.

When PILF has previously obtained personal information concerning registrants it believes are noncitizens, it has published that information in inflammatory reports.[10]  It is likely to do so again here.  PILF apparently plans to

---

[10] *See, e.g.*, PILF, *Aliens and Felons: Thousands on the Voter Rolls in Philadelphia* (October 4, 2016), at 12–17, *available at* https://publicinterestlegal.org/pilf-files/ Philadelphia-Litigation-Report.pdf) (publishing full voter names, addresses, and histories alongside report of "systemic failure in Philadelphia"); PILF, *North*

publish the names of individuals appearing on Pennsylvania voter rolls who ***may*** be noncitizens—and then accuse those individuals of committing criminal acts by unlawfully registering to vote. *See* Appx064, ECF No. 1 (Compl. ¶¶ 21–26) ("Noncitizen Registration and Voting is a Crime").

There is good reason to believe that the information requested by PILF—especially the names and contact information of the approximately 9,100 letter recipients described above—includes at least some U.S. citizens vested with the right to vote. As explained in the Department's First-Step Brief, the list of recipients was generated, at least in part, using data derived from PennDOT's driver license database. First-Step Br. at 7–8. But driver license databases can be highly inaccurate. *See N.C. State Bd. of Elections*, 996 F.3d at 261 (explaining that 97.6% of individuals identified as noncitizens by North Carolina's DMV were, in fact, citizens).

When PILF publishes the names, addresses, phone numbers, email address, or more of individuals suspected of being—but not confirmed to be—noncitizens, the named individuals face serious risk of harassment, abuse, and threats in addition to an invasion of privacy. *See Pa. State Edu. Assoc.*, 148 A.3d at 144, 157–58

---

*Carolina Motor Voter at 30 Years: The Cause and Barrier to Stopping Non-Citizen Voting* (June 2023), at 4, *available at* https://publicinterestlegal.org/wp-content/uploads/2023/06/Motor-Voter-at-30-North-Carolina-FINAL.pdf (detailing PILF's efforts to seek records where state officials identified "***potential*** aliens on the voter rolls" (emphasis added)).

(concluding public school employees had constitutionally protected privacy in their home addresses and request for disclosure required "a balancing to determine whether the right to privacy outweighs the public's interest in dissemination"). Most relevant to the NVRA, this type of naming and shaming poses a material risk of discouraging mistakenly named U.S. citizens from exercising their fundamental right to vote. Absent evidence that all 9,100 names and associated contact information at risk for disclosure are noncitizens, the disclosure sought and publication intended by PILF here threatens to discourage from voting individuals who ultimately will be "absolved of criminal wrongdoing" *after* being "placed at risk of 'public brand[ing].'" *Id.* at 267 (quoting *United States v. Briggs*, 514 F.2d 794, 803 (5th Cir. 1975)); *see Stern v. FBI*, 737 F.2d 84, 91-92 (D.C. Cir. 1984) ("[I]ndividuals have a strong interest in not being associated unwarrantedly with alleged criminal activity.").

The serious risks associated with PILF's *modus operandi* have already been realized in Virginia. In 2016, PILF released a publication containing names and addresses of individuals in Virginia that PILF claimed to have committed felonies by registering to vote or voting as noncitizens.[11] "Alien Invasion in Virginia" accused those individuals of committing multiple felonies for registering and exercising the right to vote alongside detailed information of the individuals' full

---

[11] *See generally* PILF, *Alien Invasion in Virginia*, *supra* n. 7.

names, home addresses, and phone numbers.[12]  PILF then publicized the report and demanded removal of individuals from voter rolls.  *LULAC*, ECF No. 180, at 6.  "Alien Invasion in Virginia" claimed that its disclosure "is just the tip of the iceberg" and that personally identifying information "such as those contained in this report makes prosecution an easy task."[13]

"Alien Invasion in Virginia" resulted from a request for personally identifying information strikingly similar to PILF's request in this case.  *Compare* Appx073–075 (PILF Request Letter), *with* Ltr. To Prince William County, *LULAC*, ECF No. 186-2, at 5–6.  Both requests sought "[d]ocuments regarding all registrants who were identified as ***potentially*** not satisfying the citizenship requirements for registration [to vote]."  Appx073 (emphasis added); *LULAC*, ECF No. 186-2, at 5 (verbatim and emphasis added).

The problem for PILF in Virginia, however, was that several of the disclosed individuals were, in fact, U.S. citizens fully vested with the right to vote.  PILF's rush to publish registered voters' personally identifying information actually led to a defamation suit against it.  According to the defamation plaintiffs, PILF's erroneous naming and shaming resulted in public embarrassment, reputational harm, and—most troubling—fear of exercising their fundamental and legal right to vote.

---

[12] *Id.* at 17.
[13] *Id.* at 5, 18.

*LULAC*, ECF No. 1 (Compl. ¶¶ 2, 8, 9, 48, 49, 50.) Tellingly, PILF settled the defamation case after agreeing to "robust redactions of personally identifying information to prevent innocent Virginians from being doxxed[14] (and exposed to threats and harassment) or defamed in the future."[15]

PILF's past—and likely future—conduct thwarts the public accountability and legal safeguards intended to prevent innocent U.S. citizens from suffering an invasion of privacy and freedom to exercise their voting rights free from undue intimidation, which could not be more contrary to the intent of the NVRA under the guise of which PILF seeks this information. The doxxing that will presumably occur if PILF is granted access to the information it seeks in this case risks very real harm, especially to U.S. citizens wrongly accused of being noncitizen voters who committed felonies by registering to vote. This type of "faulty doxxing" can lead to "innocent people fac[ing] problems such as loss of reputation, loss of employment, harassment, physical harm, or death."[16] Furthermore, PILF has made no showing as

---

[14] "'Doxxing' is the act of gathering, by licit and illicit means, and posting on the Internet personal identifying information ('PII') and other sensitive information about an individual." U.S. Atty's Office of D.C., *District Man Charged in Investigation of Illegal posting of Restricted Personal Information of U.S. Senators on Website* (Oct. 4, 2018), *available at* https://www.justice.gov/usao-dc/pr/ restricted-personal-information-us-senators-website.

[15] Southern Coalition for Social Justice, *Voters Strike Back and Win Settlement and Apology in Challenge to Voter Intimidation in Virginia* (July 21, 2019), *available at* https://southerncoalition.org/voters-strike-back-and-win-settlement-in-virginia/.

[16] Batuhan Kukal, *Personal Data and Personal Safety: Re-Examining the Limits of Public Data in the Context of Doxxing*, INT'L DATA PRIVACY L. (June 30, 2023),

to why disclosing registered voters' personal information furthers the purposes of the NVRA, either to encourage voter registration or ensure accurate voter rolls. In the absence of *any* showing of necessity, the invasion of information privacy sought here is simply unjustifiable. *See Pa. State Edu. Assoc.*, 148 A.3d at 157.

Pennsylvania citizens may face the same risk as the defamation plaintiffs in Virginia if PILF repeats its conduct here in Pennsylvania. Judging by the allegations in its own complaint, that is exactly what PILF intends to do. There can be little doubt that PILF intends to use the documents collected here in the same manner but without any promise to protect innocent U.S. citizens residing in Pennsylvania from being doxxed, subject to threats, in danger of harassment, or discouraged from exercising their fundamental right to vote. PILF even issued a press release following the decision below in which its president, J. Christin Adams, was quoted: "Americans have a right to documents exposing . . . non-citizens being registered and even voting."[17] Yet, in this very case, PILF asks for the identities of thousands of registered voters whose eligibility to vote has ***not*** been disproven—the very type

_____

at 3, *available at* https://academic.oup.com/idpl/advance-article/doi/10.1093/idpl/ipad011/7216381. As an extreme example, when an innocent student was wrongly identified as the perpetrator of the Boston Marathon bombing, he was later found dead by suicide. *Id.* at 3.

[17] PILF, *Pennsylvania Required To Provide PILF With Voting History Of Non-Citizens The Commonwealth Added To The Voter Roll* (April 4, 2022), *available at* https://publicinterestlegal.org/press/pennsylvania-required-to-provide-pilf-with-voting-history-of-non-citizens-the-commonwealth-added-to-the-voter-roll/.

of information that led to the defamation action in Virginia. For the reasons set forth in the Department's First-Step Brief, PILF lacks standing to bring this case and has no right to this information, *see* First-Step Br. 26–43.

Allowing the dissemination of such information only further compounds existing fears of discrimination and intimidation at Pennsylvania polls.[18] Additionally, PILF's threatened conduct likely targets a population—naturalized Americans—that already vote at rates significantly lower than native-born Americans, further undermining the purpose of the NVRA to bring eligible voters into the political process.[19]

The Court should conclude that the NVRA does not require disclosures that would undermine the spirit of the NVRA, such as disclosures of uniquely sensitive voter information—*i.e.*, names and contact information—for individuals whose eligibility to vote has not been disproven. *Kemp*, 208 F. Supp. 3d at 1345; *see Long*, 752 F. Supp. 2d at 712. The disclosure of highly sensitive personal information could have a chilling effect on the willingness of many Americans to exercise their

---

[18] *See* PBS & NPR, *State, Counties Prepare to Keep Pa. Polling Places Safe Amid Fears of Militia, Hate Groups* (Oct. 31, 2020), *available at* https://whyy.org/articles/state-counties-prepare-to-keep-pa-polling-places-safe-amid-fears-of-militia-hate-groups/ ("[Pennsylvania] voters, especially those who routinely confront racism and discrimination, [were] concerned [in 2020] about intimidation at the polls. A recent report by a worldwide nonprofit that tracks militia groups said Pennsylvania is one of five U.S. states at high risk of violence through Nov. 3[, 2020].").

[19] *See Registering Millions*, *supra* n.3, at 8.

fundamental right to vote. Voters would understandably be hesitant to register at all if their personal information was then available for public disclosure, especially in connection with efforts by a group like PILF to target *potential* noncitizens. *See, e.g.*, *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 736 (S.D. Miss. 2014); *Long*, 752 F. Supp. 2d at 711–12. That outcome would be antithetical to the NVRA's purpose of encouraging voter registration and enhancing voter participation, described above.

As a final note, to the extent PILF seeks to re-write the disclosure provisions of the NVRA, Congress—not this Court—should be its audience. Voter registration "has remained a subject of interest to Congress in the years since the enactment of NVRA," with Congress focused both on increasing widespread access to voter registration opportunities and updating and maintaining accurate voter registration lists against the backdrop of swiftly changing technology.[20] Many bills have been presented to Congress with these goals in mind, demonstrating that the political process is alive and well. This Court should not bend the NVRA so far that it breaks. PILF's attempt to twist the NVRA in order to thwart the statute's very purpose further supports reversing the district court's decision that the NVRA applies to the records at issue and remanding for dismissal or, in the alternative, entry of judgment in favor of the Department.

---

[20] *Federal Role in Voter Registration*, *supra* n.3, at 19.

## CONCLUSION

For these reasons, the Court should reverse the district court's decision and remand for dismissal or, in the alternative, entry of judgment in favor of the Department.

Dated: September 13, 2023

s/ John P. Lavelle, Jr.
John P. Lavelle, Jr.
  PA Bar No. 54279
Matthew D. Klayman
  PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
T. 215.963.5000
F. 215.963.5001

Brian C. Frontino
  FL Bar No. 95200
MORGAN, LEWIS & BOCKIUS LLP
600 Brickell Avenue, Suite 1600
Miami, FL 33131
T. 305.415.3000
F. 305.415.3001

*Counsel for* Amicus Curiae *The League of Women Voters of Pennsylvania*

## CERTIFICATE OF BAR MEMBERSHIP, COMPLIANCE WITH TYPE-VOLUME LIMITATION AND TYPEFACE REQUIREMENTS, AND VIRUS CHECK

In accordance with Local Appellate Rules 28.3(d) and 46.1(e), I certify that at least one of the attorneys whose names appear on the brief is a member of the bar of this court.

In accordance with Local Appellate Rule 31.1(c), I certify that Microsoft Defender Offline scanned the file and did not detect a virus and that any paper copies that Amicus submits will be identical to the text of the electronic brief.

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,878 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the word count of Microsoft Word for Microsoft 365 MSO. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: September 13, 2023

*s/ John P. Lavelle, Jr.*
John P. Lavelle, Jr.

*Counsel for* Amicus Curiae *The League of Women Voters of Pennsylvania*

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2023, a copy of the foregoing Brief of the League of Women Voters of Pennsylvania as *Amicus Curiae* in Support of Appellants/Cross-Appellees was filed electronically through the appellate CM/ECF system with the Clerk of the United States Court of Appeals for the Third Circuit. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: September 13, 2023

*s/ John P. Lavelle, Jr.*
John P. Lavelle, Jr.

*Counsel for* Amicus Curiae *The League of Women Voters of Pennsylvania*