No. 23-1590 & No. 23-1591
_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT
_____

## THE PUBLIC INTEREST LEGAL FOUNDATION,

**Appellee/Cross-Appellant,**

**v.**

## AL SCHMIDT, in his official capacity as SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA, and JONATHAN M. MARKS, in his official capacity as DEPUTY SECRETARY FOR ELECTIONS AND COMMISSIONS,

**Appellants/Cross-Appellees.**
_____

**Appeal From Final Order Entered by U.S. District Court for the Middle District of Pennsylvania in Case No. 1:19-CV-622**
_____
_____

## THIRD-STEP BRIEF OF APPELLANTS/CROSS-APPELLEES
_____

Daniel T. Brier
Donna A. Walsh
Myers, Brier & Kelly, LLP
425 Biden Street, Suite 200
Scranton, PA  18503
(570) 342-6100

Attorneys for Appellants/Cross-Appellees,
Secretary of the Commonwealth Al Schmidt
and Deputy Secretary for Elections and
Commissions Jonathan M. Marks

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

ARGUMENT ......................................................................................... 2

    I.    PILF Lacks Standing To Bring This Action Under the NVRA ......... 2

        A.    After *TransUnion*, an alleged informational injury that causes no concrete harm does not suffice under Article III ..... 2

        B.    PILF suffered no concrete harm from denial of access to information relating to the PennDOT software error .............. 7

        C.    The NVRA does not confer federal jurisdiction ................... 10

        D.    *Scott* is indistinguishable and persuasive here ...................... 10

    II.    The NVRA Does Not Require Disclosure of the Names and Addresses of Persons Who Were Notified of the Software Error .... 11

        A.    PILF's construction cannot be reconciled with the NVRA's text, structure or purpose ....................................................... 11

        B.    The NVRA does not authorize public access to any records bearing on voter eligibility  ................................................... 15

        C.    The Commonwealth has consistently argued that the plain text only requires disclosure of statutorily mandated programs and activities ........................................................... 18

        D.    The cases PILF cites do not support its construction ............. 18

    III.    The District Court Erred in Requiring Identification of Persons Who Canceled Their Registrations or Did Not Respond to the Letters ................................................................................................. 19

        A.    The DPPA prohibits disclosure of names and addresses of persons to whom letters were sent concerning the software error ....................................................................................... 19

B.    The names and addresses of letter recipients are uniquely
      sensitive and therefore not required to be disclosed .............22

C.    PILF agreed that registrant identities need not be disclosed
      in litigation in the Fourth Circuit...........................................24

IV.   The Records PILF Seeks Are Protected From Disclosure by the
      Work Product Doctrine.....................................................................24

A.    The work product doctrine protects analyses prepared by
      expert consultants in anticipation of litigation .......................25

B.    The district court correctly ruled that the expert's analysis
      is protected by the work product doctrine..............................27

C.    PILF offers no basis for overturning the district court
      decision................................................................................29

D.    PILF offers no authority for voiding the work product
      protection..............................................................................35

CONCLUSION .......................................................................................36

**TABLE OF AUTHORITIES**

**CASES**

*Abramski v. United States,* 57. U.S. 159 (2014) ...................................15

*Abuelhawa v. United States*, 556 U.S. 816 (2009)................................11

*Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597 (E.D. Pa. 2018) ...........31

*American Civil Rights Union v. Philadelphia City Comm'rs*, 872 F.3d 175 (3d Cir. 2017) ...............................................................31

*Arcia v. Sec'y of Fla.*, 772 F.3d 1335 (11th Cir. 2014)........................19

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247 (3d Cir. 2014)............9

*Boys Mkts., Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970) ...........11

*Campaign Legal Ctr. v. Scott*, 49 F.4th 931 (5th Cir. 2022)......................4, 10, 11

*In re Cendent Corp. Secs. Litig.*, 343 F.3d 658 (3d Cir. 2003)......................26, 35

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ..............................8

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006) ................................11

*Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221 (3d Cir. 2021) ....................25

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ................................17

*Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71 (3d Cir. 1998) ...............................................................9

*Federal Election Comm'n v. Akins*, 524 U.S. 11 (1998)..............................4, 5, 11

*Fox v. Lackawanna Cnty.*, No. 16-CV-1511, 2018 WL 4095854 (M.D. Pa. Aug. 27, 2018).........................................................29, 30

*In re Grand Jury Proc.*, 604 F.2d 798 (3d Cir. 1979)....................................25, 26

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ..............................................................15

*Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928 (7th Cir. 1995) .........................35

*Heinzl v. Cracker Barrel Old Country Store, Inc.*, No. 2:14-CV-1455, 2015 WL 6604015 (W.D. Pa. Oct. 29, 2015) ...................................................34

*Hickman v. Taylor*, 329 U.S. 495 (1947) .......................................................25, 30

*Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124 (3d Cir. 2000) ....................................................................................................33

*Huber v. Simon's Agency, Inc.*, 84 F.4th 132 (3d Cir. 2023) .........................3, 5, 6

*Huber v. Taylor*, 469 F.3d 67 (3d Cir. 2005) .......................................................18

*Kelly v. RealPage, Inc.*, 47 F.4th 202 (3d Cir. 2022) ....................................3, 5, 6

*Lance v. Coffman*, 549 U.S. 437 (2007) .................................................................7

*League of United Latin Am. Citizens-Richmond Region Counsel 4614 v. Pub. Int. Legal Found., Inc.*, No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) .........................................................................................23

*Leonen v. Johns-Manville*, 135 F.R.D. 94 (D.N.J. 1990) .....................................29

*Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318 (3d Cir. 2005) ........................34

*Lezark v. I.C. Sys., Inc.*, No. 22-1804, 2023 WL 2609815 (3d Cir. Mar. 23, 2023) .......................................................................................................3

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................7

*Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994) .....................................................32

*Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252 (3d Cir. 1993) ...............................................................................................26, 34

*Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296 (3d Cir. 1979) .................29

*National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479 (1998) ................................................................................................ 14

*Nixon v. Warner Commc'ns,* 435 U.S. 589 (1978) ................................. 6

*Pierce v. Allegheny Cnty. Bd. of Elections*, 324 F. Supp. 2d 684 (W.D. Pa. 2003) ........................................................................................... 32

*Press-Enter. Co. v. Superior Ct. of Cal. For Riverside Cty.*, 478 U.S. 1 (1986) .... 6

*Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 336 (4th Cir. 2012) ........... 19

*Public Int. Legal Found., Inc. v. N.C. State Bd. of Elections,* 996 F.3d 257 (4th Cir. 2021) ................................................................... 18, 24

*Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440 (1989) ........................ 4, 5, 11

*Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208 (1974) ............... 8

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ......................................... 8

*Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976) ................. 8

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ...................................... 15

*Spokeo, Inc. v. Robins*, 578 U.S. 440 (2016) .................................... 4, 6, 10

*Sporck v. Peil*, 759 F.2d 312 (3d Cir. 1985) ....................................... 35

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ............................ passim

*Trichell v. Midland Credit Mgmt., Inc.,* 964 F.3d 990 (11th Cir. 2020) ............... 4

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2014) .................... 17

*United States v. Ernstoff*, 183 F.R.D. 148 (D.N.J. 1998) .......................... 34

*United States v. Nobles*, 422 U.S. 225 (1975) .................................. 25, 26

*United States v. Richardson,* 418 U.S. 166 (1974) .................................. 7

v

*United States v. Rockwell Int'l*, 897 F.2d 1255 (3d Cir. 1990)................26, 27, 30

*United States v. Smith*, 123 F.3d 140 (3d Cir. 1997) ...............................................6

*Whitmore v. Arkansas*, 495 U.S. 149 (1990)...........................................................9

**STATUTES**

18 U.S.C. § 2721 .....................................................................................................19

18 U.S.C. § 2721(a)............................................................................................20, 21

18 U.S.C. § 2725(3) ................................................................................................21

52 U.S.C. § 20501(b) ..............................................................................................17

52 U.S.C. § 20507(a)(3)..........................................................................................12

52 U.S.C. § 20507(a)(4)..........................................................................................13

52 U.S.C. § 20507(b)...............................................................................................14

52 U.S.C. § 20507(c)...............................................................................................14

52 U.S.C. § 20507(c)(1)..........................................................................................22

52 U.S.C. § 20507(c)(2)(A).....................................................................................14

52 U.S.C. § 20507(d)...............................................................................................14

52 U.S.C. § 20507(d)(2)..........................................................................................14

52 U.S.C. § 20507(i) .................................................................................................1

52 U.S.C. § 20507(i)(1)...........................................................................................12

52 U.S.C. § 20507(i)(2)...........................................................................................14

52 U.S.C. § 20701 ...................................................................................................17

52 U.S.C. § 20703 ..................................................................17

52 U.S.C. § 20704 ..................................................................17

25 Pa. C.S.A. § 1901 ..............................................................13

Fed. R. Civ. P. 26(b)(3) ..........................................................35

Fed. R. Civ. P. 26(b)(4)(D) .....................................................36

## MISCELLANEOUS

8 C. Wright and A. Miller, *Federal Practice and Procedure* § 2024
   (1970) ...............................................................................25

# INTRODUCTION

The Public Interest Legal Foundation's ("PILF") opening brief fails to establish its standing to maintain this action, glosses over the records PILF requested and already received, and mischaracterizes the information that is in dispute. The Department of State has already produced to PILF thousands of records, including records of voter registration cancelations where the reason for the cancelation was non-citizenship, and the form letters sent to registrants advising them of the software error at PennDOT that allowed non-citizens to inadvertently register to vote. At issue is a privileged analysis prepared by a consulting expert engaged by specially retained outside counsel for the Department of State in anticipation of litigation over alleged illegal voting and a list of names and addresses of registrants who received notice of the error.

The public disclosure provision in the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20507(i), does not apply to the information PILF seeks and PILF lacks standing to pursue a claim under the statute in federal court. Moreover, the expert analysis is privileged work product not subject to disclosure, and the names and addresses of letter recipients are not required to be disclosed because they have not been determined to be non-citizens and disclosure of their identities would needlessly expose them to risk of harassment, abuse and intimidation.

In sum, because PILF lacks Article III standing and fails to substantiate its claim under the NVRA, this action should be dismissed for lack of jurisdiction. In the alternative, the district court's determination that the NVRA requires disclosure of the names and addresses of letter recipients should be reversed. Further, the Court should affirm the district court's well-supported ruling that the expert analysis is protected from disclosure by the work product doctrine.

## ARGUMENT

## I. PILF Lacks Standing To Bring This Action Under the NVRA.

PILF is an out-of-state organization[1] with no purported connection to any Pennsylvania voter and has suffered no harm from not having access to records relating to the PennDOT software error. *TransUnion* controls and compels the conclusion that PILF lacks standing to bring this action in federal court.

### A. After *TransUnion*, an alleged informational injury that causes no concrete harm does not suffice under Article III.

PILF insists that *TransUnion* did not change the law and that denial of a request for records under a federal statute itself qualifies as an injury-in-fact. PILF Br. at 22-23.[2] PILF is wrong on both counts.

---

[1] PILF asserts in its brief that it relocated its headquarters from Indiana to Virginia after this case was filed. PILF Br. at 7 & n.2.

[2] PILF claims that the district court had the benefit of *TransUnion* when the standing issue was decided, PILF Br. at 23-24, but this is not accurate. The district court resolved the standing challenge by way of motion to dismiss (not summary

2

This Court has expressly acknowledged that *TransUnion* refined the law of standing in cases alleging informational injury. In *Lezark v. I.C. Sys., Inc.*, the Court stated that *TransUnion* "clarified the concrete injury requirement in cases involving causes of action established by Congress . . . ." No. 22-1804, 2023 WL 2609815, at **2-3 (3d Cir. Mar. 23, 2023) (remanding to district court to "assess whether [plaintiff] has alleged a concrete injury under the standard set forth in *TransUnion*"). Similarly, in *Kelly v. RealPage, Inc.*, the Court noted that *TransUnion* "provide[d] additional guidance regarding the concreteness requirement." 47 F.4th 202, 211 (3d Cir. 2022). More recently, in *Huber v. Simon's Agency, Inc.*, the Court observed that, before *TransUnion*, courts conflated the concepts of "statutory" and "prudential" standing with Article III standing and "*TransUnion* put that confusion to rest[ by] explaining that Congress may create an 'injury' in law,' but for an individual plaintiff to proceed in federal court, Article III requires that she show her own 'injury in fact.'" 84 F.4th 132, 147 (3d Cir. 2023); *see also id.* at 140 ("Since it entered the scene in 1989, the informational injury doctrine of Article III standing has generated its share of confusion, and with each new case, its contours have come into sharper focus."). It is thus beyond debate that *TransUnion* clarified and law and set the standard that must be met by PILF to sue in federal court under the NVRA.

---

judgment, as PILF claims) on December 13, 2019. Appx020. *TransUnion* was decided by the Supreme Court on June 25, 2021.

*See Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 938 (5th Cir. 2022) (holding in case under NVRA that, "even in public disclosure-based cases, plaintiffs must . . . assert 'downstream consequences,' which is another way of identifying concrete harm from governmental failures to disclose").

Yet PILF urges this Court to ignore *TransUnion* and find there is no need to establish a separate injury-in-fact in cases brought under a federal public disclosure statute. PILF Br. at 24. To do so would be error. *TransUnion* unambiguously directs that "[a]n 'asserted informational injury that causes no adverse effects cannot satisfy Article III.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2214 (2021) (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)). The Court recognized that a plaintiff must identify an adverse effect from not having the information to have standing. *Id.* at 2214 ("plaintiffs have identified no 'downstream consequences' from failing to receive the required information") (citing *Trichell*, 964 F.3d at 1004); *see also Spokeo, Inc. v. Robins*, 578 U.S. 440, 341 (2016) ("[A] bare procedural violation, divorced from any concrete harm" does not "satisfy the injury-in-fact requirement of Article III.") (citations omitted).

Because PILF cannot identify an adverse effect from not obtaining the names and addresses of registrants who received notice of the software error, PILF argues that denial of information alone constitutes a concrete injury under *Akins* and *Public Citizen*, both of which precede *TransUnion*. PILF Br. at 20-24. Unlike PILF,

however, the plaintiffs in those cases alleged concrete and particularized harm from not having access to the information they sought. In *Akins*, a group of voters sought to compel an organization to disclose political contributions to candidates for public office to "help them. . . evaluate candidates for public office." *Federal Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998). In *Public Citizen*, public interest groups sought to review records relating to evaluations of judicial candidates to be able to "participate more effectively in the judicial selection process." *Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989). The plaintiffs in these cases had standing because they alleged concrete injury or "downstream consequences" resulting from lack of access to the information at issue. By contrast, PILF—an out-of-state organization with no connection to Pennsylvania and no interest in Pennsylvania elections—suffered no harm from not having access to information concerning the Motor Voter software error. *Akins* and *Public Citizen* do not support the exercise of jurisdiction here.

PILF leans on phrases cherrypicked from *Huber* and *Kelly* as support for its argument that there is no need to establish an injury-in-fact and entitlement to information alone qualifies as informational injury. PILF Br. at 24-25. But *Huber* and *Kelly* held no such thing. Both cases acknowledge that, to establish informational injury, a plaintiff must show that he was denied information to which he is legally entitled by statute and that the denial caused some adverse consequences

5

directly related to the purpose of the statute.  *Kelly*, 47 F.4th at 212; *Huber*, 84 F.4th

at 145.  In the words of the Supreme Court, "[n]o concrete harm, no standing."

*TransUnion*, 141 S. Ct. at 2214.  While a plaintiff need not necessarily allege any

additional harm beyond the harm Congress identified if that harm is concrete and

particularized, *Spokeo*, 578 U.S. at 342, a "bare procedural violation, divorced from

any concrete harm . . . does not suffice for Article III standing," *TransUnion*, 141 S.

Ct. at 2213 (internal citation and quotation marks omitted).  If mere denial of a

records request alone qualified as concrete injury as PILF proposes, then any person

whose request is denied would have standing to sue in federal court.  *TransUnion*

rejected this boundless interpretation of Article III.[3]

---

[3]    Judicial Watch, Inc., as *amicus curiae*, but not PILF, argues that PILF has
standing because a "public right to government records" has been "traditionally
recognized by American courts."  Judicial Watch Br. at 9-10.  The cases it cites pre-
date *TransUnion*, relate to requests made in the context of judicial proceedings for
access to court records and are not relevant here.  *See*, *e.g.*, *Press-Enter. Co. v.
Superior Ct. of Cal. for Riverside Cty.*, 478 U.S. 1 (1986) (news media moved to
access transcript in criminal case); *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597
(1978) (television networks moved to copy tape recordings introduced at criminal
trial); *United States v. Smith*, 123 F.3d 140 (3d Cir. 1997) (newspapers moved to
intervene in criminal case to access sentencing memorandum).  Moreover, as this
Court found, and as Judicial Watch acknowledges, Judicial Watch Br. at 10 n.4, there
is no "historical analogue requirement in[] the standing analysis for informational
injury claims."  *Kelly*, 47 F.4th at 212 n.8 ("[W]e do not understand *TransUnion*'s
passing discussion of informational injury, nor any other informational injury case,
to import a historical analogue requirement into the standing analysis for
informational injury claims.") (collecting cases).

*TransUnion* refined the proper standard to be applied in cases alleging informational injury and PILF does not satisfy it.[4]

**B. PILF suffered no concrete harm from denial of access to information relating to the PennDOT software error.**

No doubt recognizing that denial of a records request alone does not suffice for Article III standing, PILF argues in the alternative that it suffered injury in the form of inability to scrutinize and report on the accuracy of Pennsylvania's voter rolls and based on expenditures associated with making its request under the NVRA. PILF Br. at 26-29. Each of these arguments fails under established precedent.

PILF's interest in evaluating and compelling compliance with voter registration laws is precisely the sort of general concern that does not confer standing. The Supreme Court has repeatedly held that an interest in ensuring the government acts in accordance with law does not suffice under Article III. *See Lance v. Coffman*, 549 U.S. 437, 439 (2007) ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree.") (per curiam); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-74 (1992) ("We have consistently held that a plaintiff raising only a generally available grievance about government . . . does not state an Article III case or controversy."); *U.S. v. Richardson*, 418 U.S. 166, 173-75 (1974) (rejecting standing premised on requestor's interest in government expenditures as

---

[4] The district court decisions from outside this Circuit that PILF cites on pages 21-22 of its brief pre-date *TransUnion* and are not persuasive here.

"generalized grievance" that "is plainly undifferentiated and common to all members of the public") (citation and internal quotation marks omitted). Nor does an organization's mere interest in an issue establish standing under Article III. *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 (1976) ("[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III."); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 226 (1974) ("[M]otivation is not a substitute for the actual injury needed by the courts and adversaries to focus litigation efforts and judicial decision making."); *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) ("[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved'. . . ."). In short, PILF's interest in investigating the accuracy of Pennsylvania's voter rolls is not sufficient to confer standing.

PILF's further assertion that it is prevented from publishing any findings it might make or challenging any hypothetical non-compliance with the election laws is an even weaker basis for standing because the claimed harm is entirely speculative. A mere prospect of potential future harm is not enough for standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013) ("[R]espondents' theory of future injury is too speculative to satisfy the well-established requirement

that threatened injury must be 'certainly impending.'") (citation omitted); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III.  A threatened injury must be 'certainly impending' to constitute injury in fact."). PILF not so subtlety puts the rabbit-in-the-hat with this weak effort to create an injury claim.

Finally, PILF's argument that it incurred costs pursuing its NVRA records request is also insufficient.  Any expenditure made in relation to the request cannot be a "'downstream consequence[]' from failing to receive" the requested information as required by *TransUnion*.  141 S. Ct. at 2214.  More fundamentally, an out-of-state requestor that has not been harmed cannot "spend its way into having standing" by making expenditures on its own agenda or on preparing for litigation. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 288 (3d Cir. 2014) (organization cannot "manufacture standing by choosing to expend resources to advocate against [government] policy decisions" or "from its expenditure of resources on that very suit") (citations and internal quotation marks omitted); *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 80 (3d Cir. 1998) "[T]he pursuit of litigation alone cannot constitute an injury sufficient to establish standing under Article III.").   If incurring expenditures were enough to confer standing, *TransUnion* would be rendered  meaningless.

## C.    The NVRA does not confer federal jurisdiction.

PILF posits that requiring concrete injury to exercise federal jurisdiction over NVRA claims will "dismantle[]" the protections in the statute.  PILF Br. at 29.  This conflates the limits on federal jurisdiction imposed by the United States Constitution with Congress's authority to enact laws.  "Article III standing requires a concrete injury even in the context of a statutory violation," *Spokeo*, 578 U.S. at 341, and therefore creation of a statutory remedy "does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III," *TransUnion*, 141 S. Ct. at 2205.  Thus, finding that PILF did not suffer concrete harm within the meaning of Article III in no way undermines the NVRA.

## D.    *Scott* is indistinguishable and persuasive here.

PILF maintains that its interest in evaluating the accuracy of the voter rolls distinguishes this case from *Scott* and warrants a different outcome.  PILF Br. at 32.  But *Scott* is indistinguishable.  Like PILF, the civic engagement organizations in *Scott* did not represent any Texas voters and could not claim that their participation in the electoral process would be hindered by lack of access to information.  *Campaign Legal Ctr.*, 49 F.4th at 938-39.  The Fifth Circuit held that the organizations' claimed interest in transparency was a generalized grievance, *id.* at 936, and that their request under the NVRA "lacks downstream consequences for

purposes of Article III standing and is not controlled by either *Akins* or *Public Citizen,*" *id.* at 939. *Scott* is on all fours and supports dismissal of PILF's similar claim under the NVRA for lack of standing.

## II. The NVRA Does Not Require Disclosure of Names and Addresses of Persons Who Were Notified of the Software Error.

Through this litigation, PILF is seeking to transform the public disclosure provision in the NVRA—a statute designed and intended to encourage voting by expanding registration options and limiting when and how states can cancel voter registrations—into a tool for investigating individual voter qualifications. The NVRA cannot be read as PILF proposes.

### A. PILF's construction cannot be reconciled with the NVRA's text, structure or purpose.

PILF isolates the words "activities" and "programs" from the rest of the text, attributes to them the broadest possible meanings, and concludes that any record that bears on the accuracy of the voter rolls must be made available for public inspection. PILF Br. at 36-38. The rules of construction, however, plainly prohibit such parsing. *See*, *e.g.*, *Abuelhawa v. United States*, 556 U.S. 816, 819-20 (2009) ("statutes are not read as a collection of isolated phrases"); *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and content of the statute . . . ."); *Boys Mkts.,*

*Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 250 (1970) ("Statutory interpretation requires more than concentration upon isolated words. . . .").

PILF's isolated focus on "activities" and "programs" ignores the statutory qualifiers that "programs and activities" open for public inspection must be "implement[ed]" by a state and must be "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). The "activities" and "programs" that a state may lawfully implement concerning already registered voters are expressly limited by subsection (a)(3) which directs that "the name of a registrant ***may not be removed*** from the official list of eligible voters except" at the request of the registrant, by reason of criminal conviction or mental incapacity, or pursuant to a general program that removes the names of voters who died or changed residence. 52 U.S.C. § 20507(a)(3) (emphasis added). States are thus prohibited by the NVRA from implementing programs or activities aimed at purging registrants from the voting rolls based on suspicion they may not meet the citizenship requirement. It simply cannot be that the NVRA both ***prohibits*** states from removing registrants from the voter rolls based on suspicion of non-citizenship and at the same time ***requires*** states to disclose records for the purpose of enabling the public to investigate potential non-citizens on the voter rolls.[5]

_____

[5] In a telling attempt to bring its records request within the scope of the statute, PILF repeatedly mischaracterizes the special investigation of the PennDOT Motor Voter software error as "list maintenance," *see*, *e.g.*, PILF Br. at 26, 37, 66, and

PILF contends that, if Congress intended the public disclosure provision to apply only to records relating to removals of registrants who died or changed residence, it would have named those mandated programs or cross-referenced the subsections requiring states to implement such programs. PILF Br. at 44. But Congress did just that. The right of public inspection does not stand alone, but rather appears in the same section of the NVRA that creates the obligation to purge voters who died or moved away, uses the same words—"programs" and "activities"—that Congress used to describe the mandatory obligations, and identifies records relating to the mandatory obligations as records that must be disclosed.

The subsections that precede subsection (i) describe the mandated removals of persons who died or changed residence as "programs" and "activities" to maintain accurate voter lists. *See* 52 U.S.C. § 20507(a)(4) (requiring states to "conduct a general ***program*** that makes a reasonable effort to remove the names of ineligible

---

claims the investigation was designed to identify and remove "ineligible" voters, *id.* at 37. The Department of Justice as *amicus curiae* echoes PILF's error in describing the letters to registrants as an attempt to "find and remove" registrants who were determined not to be citizens. *See, e.g.*, DOJ Br. at 9. These characterizations are not accurate. Consistent with the NVRA, Pennsylvania has no list maintenance program aimed at systematically removing registrants from the voter rolls based on suspicion of non-citizenship and no registrations were canceled by the Department of State based on any such suspicion. *See* 25 Pa. C.S.A. § 1901 (describing list maintenance programs); *see also* Compl. ¶ 30 (Pennsylvania has no "no active process . . . to detect and remove" suspected non-citizens). The records PILF seeks are not list maintenance records and are not required to be disclosed under the NVRA.

voters from the official lists of eligible voters by reason of . . . death . . . or . . . change in the residence of the registrant. . .”); 52 U.S.C. § 20507(b) (imposing limitations on removals under “[a]ny State ***program*** or ***activity*** to protect the integrity of the electoral process . . .”);  52 U.S.C. § 20507(c) (titled “Voter removal ***program***” and describing in (1) elements of “***program***” to remove names of registrants who moved); 52 U.S.C. § 20507(c)(2)(A) (restricting completion of “***program***” to purge ineligible voters to 90 days prior to primary or general election); 52 U.S.C. § 20507(d) (imposing restrictions on removals “from the official list of eligible voters” due to change in residence) (emphasis added in all parentheticals).  The “programs” and “activities” in subsection (i) must be understood to mean the “programs” and “activities” referenced in the preceding subsections (a), (b) and (c) of the same section of the statute. *See Nat’l Credit Union Admin. v. First Nat’l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998) (“[s]imilar language contained within the same section of a statute must be accorded a consistent meaning.”).  This comports with subsection (i)(2) which states that the records required to be made available for public inspection include the change of address “notices described in subsection (d)(2).” 52 U.S.C. § 20507(i)(2).

When the complete text of the statute is considered in relation to its structure and purpose, as this Court is required to do, the only reasonable construction is one that links the public disclosure obligation to list maintenance required by the statute.

*See Abramski v. United States*, 573 U.S. 169, 179 (2014) (words in statute not interpreted "in a vacuum, but with reference to statutory context, structure, history, and purpose") (citation and internal quotation marks omitted).[6]

### B. The NVRA does not authorize public access to any records bearing on voter eligibility.

Unable to point to support in the text for requiring disclosure of records unrelated to mandated programs and activities, PILF makes an even broader argument that all records bearing on voter eligibility must be made available for public inspection. PILF Br. at 38-40. PILF proposes that, because other courts have applied the public disclosure provision to voter registration materials, then any state record relating to any voter's satisfaction of any qualification must be made available for public inspection. *Id.* This argument cannot bear its own weight.

If Congress had intended to allow the public to access ***any*** record relating to any registrant's eligibility, the public disclosure provision would have directed states

---

[6] PILF tries to bootstrap its arguments by pointing to similar positions advanced by the Department of Justice in *amicus* filings in other cases. PILF Br. at 46-48. The Department of Justice offers those same arguments in its *amicus* brief, which are incorrect for the reasons herein. With great respect for work done by the Department of Justice, the positions advanced by its appellate counsel are not controlling or owed any deference. Where, as here, a government agency offers an interpretation of a federal law unrelated to exercise of any delegated rulemaking authority, the weight to be given its interpretation depends upon its power to persuade. *See Gonzales v. Oregon*, 546 U.S. 243, 256 (2006) (absent Congressionally delegated authority to make rules carrying the force of law, federal agency's interpretation of statute entitled to respect "only to the extent it has the 'power to persuade'") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

to "make available all records relating to any voter's eligibility." This is not what Congress did. Rather, Congress carefully and deliberately limited the public disclosure obligation to "the implementation of programs and activities conducted for the purpose" of maintaining the voter rolls. PILF's expansive and unbounded interpretation of subsection (i) contradicts this text and therefore necessarily fails.

PILF suggests that cases interpreting the NVRA to require disclosure of completed voter registration applications undermine the Commonwealth's position that subsection (i) applies only voter removal programs, PILF Br. at 37-38, but there is no inconsistency. The Commonwealth maintains that the NVRA only requires public disclosure of records relating to programs and activities mandated by the statute. Because the NVRA does not require or permit states to summarily cancel voter registrations based on a suspicion of non-citizenship and no registrations were canceled based on suspicion of non-citizenship, the NVRA does not require disclosure of records relating to the software error.

PILF's unbounded interpretation of the disclosure provision would also lead to absurd results. If the NVRA were read as PILF proposes to require states to publicly disclose *any* information bearing on a registrant's eligibility to vote, then any state record potentially relevant to any voter qualification would be required to be disclosed regardless of whether the record was actually considered or used, or could lawfully be considered or used, in maintaining or updating the voter rolls. The

NVRA cannot reasonably be read to require such full-scale access to voter information and voting records. The NVRA was intended to encourage voting and provide transparency into statutorily compelled list maintenance programs that affect membership on the voter rolls, 52 U.S.C. § 20501(b), not to arm citizen vigilantes with unfettered access to records to conduct their own "investigations" into individual voters and their qualifications. *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 722 (S.D. Miss. 2014) ("[T]he NVRA was not designed as a tool to root out voter fraud . . . or any other . . . allegedly illegal activity associated with casting a ballot on election day."). PILF's interpretation also would allow requesters greater access to and use of voter records than the access allowed to the Attorney General under the Civil Rights Act, 52 U.S.C. §§ 20701, 20703, 20704. That cannot be what Congress intended.[7]

---

[7]  The Department of Justice acknowledges in its *amicus* submission that the Attorney General's right to access and use voter records under the Civil Rights Act is narrower than PILF's proposed construction of the NVRA and suggests that Congress intended to expand the Attorney General's right of access through the NVRA without explicitly referencing the Civil Rights Act. DOJ Br. at 23. The NVRA, however, cannot be read as impliedly repealing the Civil Rights Act. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (recognizing "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute") (citation and internal punctuation marks omitted). The more reasonable construction of the NVRA is the one advanced by the Commonwealth which limits the right of public access in the NVRA to records relating to programs mandated by the NVRA.

**C.    The Commonwealth has consistently argued that the plain text only requires disclosure of statutorily mandated programs and activities.**

PILF contends that the Commonwealth waived a plain reading construction of the statute by not challenging the district court's common definitions of "programs" and "activities."  PILF Br. at 34-35.  This misapprehends both the Commonwealth's argument and the concept of waiver.  The Commonwealth has consistently argued that the public disclosure provision is limited to programs mandated by the statute.  PILF acknowledged the Commonwealth's argument and offered a response in its brief.  *See* PILF Br. at 35 ("The Commonwealth[] . . . argues that the Public Disclosure Provision's scope is limited to records concerning 'voters who died or moved.'  Doc. 25 at 31.").  There was no waiver.  *Huber v. Taylor*, 469 F.3d 67, 75 (3d Cir. 2005) (argument is not waived if it is "inherent in the parties' positions throughout the case").

**D.    The cases PILF cites do not support its construction.**

PILF claims that the "uniform weight of authority" supports its construction of the NVRA, PILF Br. at 33, 39, 43, but the cases it cites did not resolve the statutory construction issue presented here.  *See Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021) (reversing decision by district court to dismiss complaint under NVRA "based on the sensitive nature of the information sought and the potential for abuse"; no direct challenge to

application of statute to investigation of citizenship); *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1344 (11th Cir. 2014) (holding that state is not permitted to systematically remove voters from voting rolls within 90 days of election; did not reach issue of whether state is authorized to implement program for investigation and removal of non-citizens); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 336 (4th Cir. 2012) (holding that voter registration applications fall within disclosure mandate in NVRA).

## III. The District Court Erred in Requiring Identification of Persons Who Canceled Their Registrations or Did Not Respond to the Letters.

Even if the NVRA could reasonably be read as PILF proposes to require disclosure of records unrelated to programs and activities mandated by the NVRA, the names and addresses of persons who received letters concerning the software error should not be required to be disclosed. The District Court erred in entering summary judgment for PILF on this issue.

### A. The DPPA prohibits disclosure of names and addresses of persons to whom letters were sent concerning the software error.

PILF maintains that the district court properly "balanced" and "harmonize[d]" the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, and NVRA by ordering that the names and addresses of persons who received notice of the software error must be disclosed, PILF Br. at 53, 56, but the district court had no such discretion. The DPPA directs that personal information derived from a driver record

19

"shall not knowingly [be] disclose[d] or otherwise ma[d]e available to any person or entity." 18 U.S.C. § 2721(a). The prohibition is clear and not subject to balancing or harmonizing.

PILF misstates the issue in claiming that the Commonwealth should be compelled to turn over names and addresses of persons who received the notice because the names and addresses of registrants are already in the SURE database. PILF Br. at 55. The point is not that the names and addresses are in the SURE database. Rather, this protection is sourced to the DPPA because the identities of individuals who received notice of the software error were derived directly from driver record information protected by the DPPA. PILF did not appeal and does not now contest the district court's ruling that information derived from a driver license is required to be protected by the DPPA. Appx017 (holding that "glitch-related records and derivative lists created during the Commonwealth's investigation" are exempted from disclosure by DPPA "to the extent they include personal information obtained by the DMV in connection with a motor vehicle record").

The district court further ruled that, where all of the information in a record derives from a driver license record, that information need not be disclosed. Appx037 ("When the entirety of the information in a document or other record is derived from personal information obtained from DMV records, the whole of the record may be withheld."). PILF does not challenge this ruling either. This is fatal

to PILF's effort to discover names and addresses of the letter recipients. Because derivative lists created during the Department's privileged investigation, including the names and addresses of persons to whom letters were addressed, are themselves protected by the DPPA, the Department cannot be compelled to disclose this information.[8]

---

[8] In its *amicus* submission, Lawyers Democracy Fund theorizes that citizenship information in driver license records is not protected by the DPPA because it is collected for voter registration, not for administration of driver licenses. Lawyers Democracy Fund Br. at 7-12. This is not accurate. Persons are required to produce citizenship information in order to obtain a learner's permit, driver's license or PennDOT identification card. *See* Identification, Residency, and Legal Presence Requirements for non-United States Citizens, available at https://www.dot.state.pa.us/public/dvspubsforms/bdl/bdl%20publications/pub%20195nc.pdf (last visited December 4, 2023). Lawyer Democracy Fund's argument is also at odds with the NVRA which, as Lawyers Democracy Fund acknowledges, requires states to utilize a form for voter registration that does not require proof of citizenship but rather only an attestation by the registrant that he or she is a United States citizen. *Id*. at 15 n.3. Further, the confidentiality obligation in the DPPA applies to any "personal information" obtained in connection with a motor vehicle record. 18 U.S.C. § 2721(a). "Personal information" is defined as "information that identifies an individual, including . . . name[ and] address . . . ." 18 U.S.C. § 2725(3). Here, the district court ruled that INS indicators in a driver license record are protected by the DPPA. Appx017. PILF did not appeal this ruling. Further, Lawyers Democracy Fund misapprehends the documents at issue. PILF is not seeking data transferred from PennDOT to the Department of State in relation to voter registration, Lawyers Democracy Fund Br. at 16, but rather the identities of persons who received letters advising them of the software error—information derived from driver license records and therefore protected by the DPPA.

**B.  The names and addresses of letter recipients are uniquely sensitive and therefore not required to be disclosed.**

PILF does not dispute that uniquely sensitive personal information is not required to be disclosed under the NVRA, but rather argues that the names and addresses of persons who received notice do not fit this description.  PILF Br. at 60-62.  PILF offers by way of comparison that names and addresses of persons who received address verification letters are subject to public inspection under the NVRA.  *Id.* at 60-62.  There are material differences, however, between the two types of letters.

Change of address letters are sent as part of mandatory list maintenance to persons identified by the U.S. Postal Office as likely to have changed addresses.  52 U.S.C. § 20507(c)(1).  It is not a crime to change residences.  Any person who received an address verification notice but did not actually move is not exposed to potential criminal prosecution and is not likely to feel intimidated into not voting.  By contrast, public disclosure of the names and addresses of persons who received notice of the software error poses substantial risk of intimidation and harassment.  Unlike address information in possession of the U.S. Postal Service, there is no current public federal repository of citizenship information.  Nor has there been any determination by the Department of State that individuals who received letters are not U.S. citizens.  Ordering publication of their names and addresses and permitting unfettered use and redisclosure of this information unnecessarily exposes those

persons to public shaming, harassment and threats of criminal prosecution. As the League of Women Voters demonstrated in its *amicus* brief, requiring disclosure of this information compounds existing fears of discrimination and intimidation at the polls and targets naturalized American citizens who already vote at rates lower than native-born Americans, further undermining the purpose of the NVRA. League of Women Voters of Pa. Br. at 19.

PILF's refusal to acknowledge the risk is itself a concern. PILF downplays the potential harm to registrants as "imaginary threats," Br. at 56, but the risk is real. In a case brought against PILF in the U.S. District Court for the Eastern District of Virginia by voters claiming that PILF falsely accused them of being non-citizens, the court found that PILF's conduct states a plausible claim for voter intimidation in violation of the Voting Rights Act and the U.S. Constitution and denied PILF's motion to dismiss, explaining:

> [PILF and its President] have linked Plaintiffs' names and personal information to a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium. Defendants' suggestion that more is needed to support a finding of intimidation is untenable. . . . Plaintiffs have alleged, plausibly that [PILF's] *Alien Invasion* reports put them in fear of harassment and interference with their right to vote. They have alleged intimidation sufficient to support their § 11(b) claim.

*League of United Latin Am. Citizens—Richmond Region Counsel 4614 v. Public Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13,

2018) (internal citations omitted). The Department of Justice agrees that PILF is "wrong to claim . . . that disclosures of personally identifiable information are 'imaginary threats.'" DOJ Br. at 29.

The concern over voter intimidation is, alone, compelling cause for withholding the names and addresses of registrants who have not been confirmed to be non-citizens.[9]

## C. PILF agreed that registrant identities need not be disclosed in litigation in the Fourth Circuit.

In its brief, PILF advocates for the same redaction scheme used in *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*. PILF Br. at 59. PILF fails, however, to acknowledge that, after remand, PILF and North Carolina state officials agreed that no personal identifiers would be disclosed. Commw. Opening Br. at 11. There is no reason for different treatment here.

## IV. The Records PILF Seeks Are Protected From Disclosure by the Work Product Doctrine.

In the midst of state and local government investigations and intense media attention over the Motor Voter software error, officials at the Department of State retained outside counsel to provide legal advice in anticipation of litigation over

---

[9] PILF suggests that exemptions from disclosure laws are recognized only "in rare, specific, and extreme cases," PILF Br. at 57, and cites on page 58 cases involving First Amendment challenges to laws implicating the right to freedom of association. That test and those cases have no application here.

potential voting by non-citizens. Outside counsel in turn engaged a consulting expert to assist in providing that legal advice. Appx087 (Torres Aff. ¶ 6); Appx. 094 (Marks Declaration, ECF 64-1) ¶¶ 15-16. The district court correctly ruled that the work product doctrine protects the expert analysis and related materials from disclosure. Appx040-043. PILF offers no basis or authority for reversal.[10]

## A. The work product doctrine protects analyses prepared by expert consultants in anticipation of litigation.

The work product doctrine, first recognized by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495 (1947), "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). The doctrine "reflects the strong 'public policy underlying the orderly presentation and defense of legal claims.'" *Id.* at 236-37 (quoting *Hickman*, 329 U.S. at 510). This Court has recognized that "[p]rudent parties anticipate litigation and begin preparation prior to the time suit is formally commenced." *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir. 1979) (quoting 8 C. Wright and A. Miller, *Federal Practice and Procedure* § 2024, at 198 (1970)). The relevant test is whether, "in light of the nature of the document and the factual situation in the particular case, the document can

---

[10] In cases involving summary judgment, the standard of review is plenary. *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 229 (3d Cir. 2021). The entry of summary judgment is properly affirmed where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 229-30.

fairly be said to have been prepared or obtained because of the prospect of litigation."

*Martin v. Bally's v. Park Place Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir. 1993)

(quoting *In re Grand Jury Proceedings*, 604 F.2d at 803)); *see also United States v.*

*Rockwell*, 897 F.2d 1255, 1266 (3d Cir. 1990). The anticipation of litigation is

evaluated from the perspective of the party preparing or ordering preparation of the

document and must be objectively reasonable. *Martin*, 983 F.2d at 1260.

Because the work product doctrine is intensely practical and grounded in the

realities of litigation in our adversary system, the protection extends to material

prepared by an attorneys' agent when the agent acts at the attorney's direction.

*Nobles*, 422 U.S. at 238-39 ("doctrine protect[s] material prepared by agents for the

attorney as well as those prepared by the attorney himself"). Analyses like those at

issue here which are prepared by a consultant retained by counsel for purposes of

providing legal advice in relation to litigation are protected by the work product

doctrine. *See*, *e.g.*, *In re Cendent Corp. Secs. Litig.*, 343 F.3d 658, 667-68 (3d Cir.

2003) (work product protection applied to advice from litigation consultant retained

by counsel to assist in witness preparation); *In re Ford Motor Co.*, 110 F.3d 954,

967-68 (3d Cir. 1997) (work product protection applied to technical assistance

provided by consultant retained by outside counsel to assist in defense of claims);

*Martin*, 983 F.2d at 1261 (work product protection applied to report concerning

workplace equipment prepared by consulting expert at request of company counsel).

**B.** **The district court correctly ruled that the expert's analysis is protected by the work product doctrine.**

The district court ruled that the Commonwealth "met its burden of showing the records in question are protected by the work product doctrine because all relevant evidence supports the Commonwealth's assertion that the expert conducted the noncitizen matching analysis in preparation of possible litigation." Appx042. This ruling is unassailably correct.

As the district court noted, the software "glitch created considerable public attention." Appx040. The issue was the subject of news reports and hearings in the Pennsylvania General Assembly concerning non-citizens on the voter rolls and unlawful voting. *Id.*, citing ECF No. 66 ¶¶ 6-7, 9 n.2; ECF 66-2 (Written Testimony Presented to House State Gov't Comm., Public Hearing on Non-Citizens Voting, October 25, 2017); ECF 66-3 (Written Testimony Presented at Senate State Gov't and Transp. Comms. Public Hearing on Motor Voter, Unlawful Voting & Cybersecurity, Dec. 12, 2017); ECF 66-5 (Transcript Excerpt of Hearing Before Commonwealth of Pa. State Gov't Comm., Presentation on Noncitizens Registered To Vote in Pennsylvania, Oct. 25, 2017). The district court reasoned that "[t]he risk of litigation in the wake of a public scandal involving the possibility of illegal voting, coupled with an atmosphere of anxiety about election security, is obvious." Appx040. Relying on *In re Ford* and *Rockwell*, the district court found that it was

reasonable for the Commonwealth to anticipate litigation arising from the concerns over illegal voting:

> [D]espite the absence of a specific notice of intent to file suit, the general threat of litigation in the wake of such a resonant scandal is sufficient to invoke the work-product doctrine. It is clear to the court that, in light of the hue and cry over the glitch, the Commonwealth developed the noncitizen matching analysis with the assistance of its expert as a means of responding to heightened scrutiny of the kind that would be imposed through the civil justice system.

Appx041.

The district court further found that the expert analysis sought by PILF was prepared by the consulting expert for no purpose other than the anticipation of litigation. Appx041. The district court referenced sworn statements from Deputy Secretary Marks (ECF 64-1) and former Acting Secretary of the Commonwealth Robert Torres (ECF 64-3) attesting that the Department of State engaged outside counsel who in turn engaged the consulting expert in anticipation of litigation over potential voting by non-citizens. Appx042. The district court also referenced deposition testimony from Deputy Secretary Marks describing litigation concerns as the reason for the expert engagement and analysis. *Id.* (referencing ECF-66-1 (Marks Dep. 141:6-11, 142:9-16, 146:10-14, 148:4-8, 189:7-9)). The district court found that the Commonwealth "provide[d] sufficient information about the noncitizen matching analysis and its origins" to establish work product protection,

Appx042, and "PILF offer[ed] a great deal of speculation but no evidence suggesting the expert conducted the noncitizen matching analysis for any purpose other than the anticipation of litigation," Appx041. The district court specifically rejected PILF's argument that the Commonwealth's "carried out the noncitizen matching analysis in the ordinary course of business," explaining that "[n]o evidence suggests the analysis was a routine part of the Commonwealth's duties." Appx040 n.8.

Based on this reasoning, the district court properly ruled that "the work-product doctrine shields the records produced in conjunction with the noncitizen matching analysis from disclosure." Appx043. This was not a close call.

## C. PILF offers no basis for overturing the district court decision.

PILF asserts that the work product doctrine does not apply because there was no specific threat of litigation, PILF Br. at 67, and because the expert performed the analysis in the ordinary course of business, PILF Br. at 69-70. The first argument misstates the law and the second argument contradicts the undisputed record facts.

PILF cites a single unpublished district court opinion[11] as ostensible support for the proposition that there must be a "specific claim" to trigger work product

---

[11]   PILF cites *Fox v. Lackawanna Cnty.*, No. 16-CV-1511, 2018 WL 4095854 (M.D. Pa. Aug. 27, 2018), as support for the proposition that a "specific claim" is required.   The passage from *Fox* that PILF quotes on page 64 of its brief is a reference to the concurring opinion of Judge Greenberg in *Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296, 305 (3d Cir. 1979), which in turn quotes the District of New Jersey decision in *Leonen v. Johns-Manville*, 135 F.R.D. 94, 96 (D.N.J. 1990).   Notwithstanding the reference to a "specific claim," *Fox* went on to say that

protection, PILF Br. at 64, but that is not the law. *Hickman* directs that work product protection applies to "materials collected by an adverse party's counsel in the course of preparation for ***possible*** litigation." *Hickman*, 329 U.S. at 505 (emphasis added). This Court framed the relevant test as whether a "document can fairly be said to have been prepared or obtained because of the ***prospect*** of litigation." *Rockwell Int'l*, 897 F.2d at 1266 (emphasis added) (citation and internal quotation marks omitted). To qualify for protection, material need not have been prepared in anticipation of specific litigation. *In re Ford Motor Co.*, 110 F.3d at 967 ("[T]he material [must] be prepared in anticipation of *some* litigation, not necessarily in anticipation of the *particular* litigation in which it is being sought.") (emphasis in original). The district court applied the right standard, noting that there need not be a "specific threat from a specific party," but rather the threat can be "general." Appx040. This too was correct.

PILF denies the risk of litigation, PILF Br. at 67-68, but the record proves the litigation concern was objectively reasonable. As the district court found, the Motor Voter software error was the subject of intense public scrutiny, including an investigation by the State Government Committee of the Pennsylvania House of

_____

the work product doctrine applies to material "prepared in anticipation of some litigation, not necessarily in anticipation of . . . particular litigation," 2018 WL 4095854 at *3, and held that the doctrine applied in that case given "the prospect of litigation," *id.* at *4. *Fox* thus recognizes that a specific threat of litigation is not required to warrant work product protection.

Representatives where PILF's own counsel testified about litigation filed against Pennsylvania government agencies and officials involving allegations of illegal voting by ineligible persons. Appx040-41 (citing ECF 66-5 (Transcript of Presentation to State Government Committee on October 25, 2017)); *see also* Compl. (ECF 1) ¶ 44.[12] At the hearing, Mr. Johnson testified about a case PILF brought against Philadelphia election officials alleging that they failed to purge convicted felons from the voting rolls. *See* Tr. of Proceedings at 69 (referencing *American Civil Rights Union v. Philadelphia City Comm'rs*, 872 F.3d 175 (3d Cir. 2017)); *see also* Compl. (ECF 1) ¶¶ 44-45. At the same hearing, Ms. Kerns testified about federal lawsuits against, *inter alia*, the Department of State alleging various illegalities with respect to a special election. *See* Tr. at 79 (referencing *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597 (E.D. Pa. 2018)). In his deposition, Deputy Secretary Marks identified a risk that PILF might commence litigation as informing the anticipation of litigation here. Marks Dep. (ECF 66-1) at 146:15-18.

PILF suggests in its brief there would have been no basis to bring a legal action, PILF Br. at 68, but in the same document touts its experience suing government officials to enforce voting laws, including suits brought against

---

[12] As noted in Paragraph 44 of PILF's Complaint, the transcript of the October 25, 2017 hearing before the State Government Committee of the House of Representatives is available at http://www.legis.state.pa.us/WU01/LI/TR/Transcripts /2017_0109T.pdf (last visited December 4, 2023).

Pennsylvania officials. PILF Br. at 7-8. Candidates and their supporters have also brought actions against government officials challenging election outcomes based on allegations of illegal voting. *See*, *e.g.*, *Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994) (alleging that election officials allowed illegally obtained absentee ballots to be cast); *Pierce v. Allegheny Cnty. Bd. of Elections*, 324 F. Supp. 2d 684 (W.D. Pa. 2003) (claiming denial of equal protection based on allegedly disparate practices for returning absentee ballots). The threat of litigation was real, reasonably perceived and extant. Nothing suggests otherwise.

PILF argues, in the alternative, that the Commonwealth's outside counsel retained the expert in the ordinary course of business to remedy the software error, not out of concern for litigation over allegations of illegal voting, and offers as purported support the same Marks deposition excerpt and same press statement considered and dismissed by the district court. PILF Br. at 65-67. As the district court recognized, the Marks excerpt and press statement do not in any way suggest the expert analysis was intended to solve the software error rather than prepare for litigation. Appx040-41 nn. 8 & 9. The Marks testimony that PILF quotes on page 65 (Marks Dep. at 115:12-21) relates to the earlier search of the SURE database conducted by state officials to identify registrations canceled due to non-citizenship (the Commonwealth has provided the search results to PILF, Commw. Br. at 13). When Deputy Secretary Marks described the different analysis by the expert

engaged by outside counsel, he "unequivocally describes litigation concerns as motivating the analysis." Appx041 at n.9 (citing ECF 64-1 (Marks Decl.) ¶ 17; Marks Dep. 146:10-147:3).[13] The press statement referenced on page 66 of PILF's brief describes the letters sent to registrants advising them of the software error. Appx042 n.9. While the statement refers generally to efforts to address the software error, it says nothing about why outside counsel and the consulting expert were retained and does not suggest the expert analysis was commissioned for a purpose other than litigation. The district court correctly found that there is no evidentiary support for PILF's argument that the expert analysis was created in the ordinary course of business. Appx040-41 nn. 8 & 9.

PILF tries to analogize the consulting expert's analysis to the memorandum analyzing a beneficiary's claim to interest on past due retirement benefits in *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124 (3d Cir. 2000), PILF Br. at 70-72, but there is no comparison. The memorandum in *Holmes* was prepared in the course of administering the pension plan for use by the plan administrator in deciding whether the plan would pay interest on past due benefits. *Id.* at 129. The documents at issue in the other cases cited by PILF, *Heinzl* and *Ernstoff,* were

---

[13]   PILF also refers on page 65 to Deputy Secretary Marks's written testimony submitted to the State Government Committee in relation to the October 25, 2017 hearing on non-citizen registrants. *See* ECF 66-2. That testimony also refers to the search of the SURE database by government officials, not the expert analysis at issue here.

similarly prepared by party employees or agents acting in the regular course of business. *See Heinzl v. Cracker Barrel Old Country Store, Inc.*, No. 2:14-CV-1455, 2015 WL 6604015, at *7 (W.D. Pa. Oct. 29, 2015) (evaluation of restaurants for accessibility to disabled persons "created during the normal course of business, without any involvement of counsel" are "ordinary business documents"); *United States v. Ernstoff*, 183 F.R.D. 148, 151, 156 (D.N.J. 1998) (documents relating to random testing of housing rental market "prepared in the ordinary course of . . . business" prior to involvement of counsel).[14] The facts here are very different. The Commonwealth had no regular practice of engaging experts to compare the voter rolls to other state databases and would not have engaged outside counsel but for the allegations of illegal voting and the prospect of litigation. The work product doctrine squarely applies. *Martin*, 983 F.2d at 1261l; *In re Ford*, 110 F.3d at 967-68.

Put simply, PILF failed to offer any evidence suggesting the expert analysis voters was conducted for any purpose other than the anticipation of litigation. The district court properly entered summary judgment in favor of the Commonwealth on the work product issue.

---

[14] PILF's assertion that the Commonwealth's invocation of work product protection is supported by a "single paragraph," PILF Br. at 67, is belied by the record and its attempted analogy to the unsupported invocations in the cases cited on page 67 demonstrably fails.

**D.     PILF offers no authority for voiding work product protection.**

In a last ditch effort to access the protected records, PILF urges the Court to recognize an exception to the work product doctrine given the "unique circumstances of this case." PILF Br. at 72-74. PILF cites no support or authority for its unprecedented request and there is none. Contrary to PILF's argument, the expert's analysis, which was based on communications with outside counsel, constitutes opinion work product entitled to rigorous protection. *See Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985) ("Opinion work product . . . is accorded an almost absolute protection from discovery because any slight factual content that such items may have is generally outweighed by the adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases."); *see also In re Cendent Corp. Secs. Litig.*, 343 F.3d at 667 (information relating to engagement of consulting expert "goes to the core of the work product doctrine").

PILF also claims "substantial need" for the analysis, PILF Br. at 73, but does not identify any such need. Further, the "substantial need" exception applies only in the context of civil discovery where "the party shows it has substantial need for the materials to prepare its case. . . ." Fed. R. Civ. P. 26(b)(3). It does not apply

here.[15]  Finally, PILF claims that reversal is required because it received no privilege log, PILF Br. at 72, but this is not a discovery dispute and, if it were, no log would be required because facts known and opinions held by consulting experts are not discoverable, Fed. R. Civ. P. 26(b)(4)(D), or required to be logged, *see also* Advisory Committee Note, 1993 Am. ("The obligation to provide pertinent information concerning withheld privileged materials applies only to items 'otherwise discoverable.'").[16]

## CONCLUSION

For the reasons above, the Court should reverse and remand with direction to dismiss this action for lack of standing.  Alternatively, the Court should reverse the district court's decision that the NVRA applies to the records at issue and remand for entry of judgment in favor of the Department.   In the event the NVRA is determined to apply, the district court's decision to require production of names and

---

[15]   A different section of Rule 26 addresses the protection of facts known to and opinions held by experts retained in anticipation of litigation who are not expected to be called as a witness at trial.  Fed. R. Civ. P. 26(b)(4)(D).

[16]   A few additional misstatements by PILF warrant correction.  The Motor Voter error was discovered in 2017, Appx092 (Marks Decl.) ¶ 7), not 2015 as PILF speculates, PILF Br. at 65.  The Department of State did not "identif[y] ineligible registrants" on the voter rolls as PILF claims on page 73.  Rather, letters were sent to registrants whose qualifications were not able to be confirmed.  The letter recipients were not determined to be non-citizens.  And the Commonwealth did not then and does not now "claim[] to have believed the threat of litigation might simply be in the air," as PILF contends on page 68.

addresses should be reversed and the decision that the expert analysis is work product should be affirmed.

Respectfully submitted:

/s/ Donna A. Walsh
Daniel T. Brier
Donna A. Walsh

Attorneys for Appellants/Cross-Appellees, Secretary of the Commonwealth Al Schmidt and Deputy Secretary for Elections and Commissions Jonathan M. Marks

Myers, Brier & Kelly, LLP
425 Biden Street, Suite 200
Scranton, PA  18503
(570) 342-6100

Date:  December 4, 2023

## CERTIFICATE OF BAR MEMBERSHIP

I certify pursuant to Local Rule 46.1 that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Donna A. Walsh

Date:  December 4, 2023

## CERTIFICATE OF COMPLIANCE AND
## VIRUS SCAN CERTIFICATION

I, Donna A. Walsh, hereby certify as follows:

1.      The foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because the brief has been prepared in proportionally spaced typeface using Microsoft Word 14 point Times New Roman font;

2.      The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(A)(i) because it contains 9315 words, excluding those parts of the brief excluded by Fed. R. App. R. 32(f), as calculated using the word count function on Microsoft Word software;

3.      The text of the electronic and hard copies of this brief are identical; and

4.      A virus scan was run on the electronic copy of this brief using Trend Micro OfficeScan and no viruses were detected.

/s/ Donna A. Walsh
Donna A. Walsh

Date:  December 4, 2023

## <u>CERTIFICATE OF SERVICE</u>

I, Donna A. Walsh, hereby certify that a true and correct copy of the Third

Step Brief of Appellant/Cross-Appellee was served upon the following counsel of

record via the Court's ECF System on this 4th day of December 2023:

Noel H. Johnson, Esquire
Kaylan Phillips, Esquire
Public Interest Legal Foundation
107 S. West Street, Suite 700
Alexandria, VA  22314

Linda A. Kerns, Esquire
Law Offices of Linda A. Kerns, LLC
1420 Locust Street, Suite 200
Philadelphia, PA  19102

/s/ Donna A. Walsh
Donna A. Walsh